# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THOMAS C. WATTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-04-511-P |
| ) | |
| JO ANNE B. BARNHART, ) | |
| **Commissioner of the Social Security** ) | |
| **Administration,** ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

The claimant, Thomas C. Watts, pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability benefits under the Social Security Act. The claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred, because the ALJ incorrectly determined he was not disabled. For the reasons discussed below, the Commissioner's decision should be REVERSED and REMANDED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only "if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work in the national economy . . ." *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) [citation omitted]. The term substantial evidence has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The court may not reweigh the evidence nor substitute its discretion for that of the agency. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must

---

[1] Step one requires claimant to establish he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that claimant establish he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See id*. §§ 404.1521, 416.921. If claimant is engaged in substantial gainful activity (step one) or if claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity (RFC) to perform his past relevant work. If claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which claimant–taking into account his age, education, work experience, and RFC–can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born on October 17, 1973, and was 30 years old at the time of the hearing before the ALJ. He has a limited education and no past relevant work within the 15-year time period. The claimant alleges he has been unable to work because of mental retardation, adjustment disorder, antisocial personality disorder, psychotic disorder, and major depression.

**Procedural History**

The claimant previously filed applications for benefits in July 1999 and May 2002, but both applications were denied at the initial level. On February 20, 2003, the claimant filed his current application for supplemental security income payments under Title XVI (42 U.S.C. § 1381 *et seq*.). The application was denied in its entirety initially and on reconsideration. A hearing was held before ALJ Eleanor Moser on January 29, 2004, and she issued a decision finding the claimant was not disabled on April 21, 2004. On September 24, 2004, the Appeals Council denied review of the ALJ's findings. Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made her decision at step five of the sequential evaluation. She found the

claimant had the residual functional capacity ("RFC") restricting him to work where interpersonal contact was incidental to the work performed, the complexity of tasks was learned and performed by rote, with few variables and little judgment, and supervision was simple, direct, and concrete (Tr. 22). The ALJ concluded the claimant was not disabled, as he could perform other jobs in the national and regional economies, *e.g.*, housekeeping cleaner (Tr. 23).

**Review**

The claimant's only assignments of error relate to the ALJ's analysis at step three as to whether the claimant's mental impairments meet or equal Listing 12.05(C). The undersigned Magistrate Judge finds that the ALJ did err at step three and that the decision of the Commissioner should be reversed and remanded for reconsideration by the ALJ.

Medical records show the claimant underwent a psychological evaluation with psychological assistant Don Parham in August 1999. The claimant reported he had recently attempted suicide by overdosing on Bufferin, because he was depressed and was having problems handling the pressures in his life. He had poor impulse control, exhibited negative attitude and mood, and had an explosive temper. Mr. Parham noted that the assessment techniques he used included a clinical interview, WAIS-III, Wide Range Achievement Test Revised, ABLE Reading Test, Sentence Completion, and Carroll Rating Scale. The claimant's results on the WAIS-III showed he was functioning in the mild range of mental retardation with a verbal IQ of 70, performance IQ of 68, and a full scale IQ of 68. It was noted that all the subtests were within the same general range and showed little or no

intellectual potential above this level. Dr. Parham concluded that other tests and observations suggested the claimant was experiencing a great deal of emotional and personality conflict manifest in depression and a very poor tolerance for frustration. He was assessed with mild mental retardation and severe dysthymic disorder. Dr. Parham opined the claimant would have difficulty in any type of training program outside of simple job tasks because of his below average intellectual and academic ability. He believed he would work better with things than with people and should be shown how to perform a simple task rather than being told or required to learn through reading materials (Tr. 169-70).

In September 1999 the claimant underwent a psychological evaluation with B. Todd Graybill, Ph.D. Dr. Graybill found that the claimant did not exhibit any speech problems during his evaluation, but he was unable to read, write, or perform simple arithmetic calculations. The claimant's results on the WAIS-R were a verbal IQ of 67, performance IQ of 69, and full scale IQ of 66, placing him in the mentally retarded range of intellectual functioning. Dr. Graybill believed these test results were a valid representation of the claimant's intellectual abilities. Subtest scores revealed the claimant was functioning in the mentally retarded range in verbal comprehension and in perceptual/organizational abilities. The claimant also showed extreme impairment in his attention span and concentration abilities and he had difficulty following and retaining simple directions while taking the test. Based on the testing, Dr. Graybill found his judgment was suspect and that he could not manage his own benefits (Tr. 171-72).

The claimant underwent another psychological evaluation in November 1999 with Dr.

George Blake, M.D. Dr. Blake described the claimant's attitude as flippant, the degree of cooperation as fair, and the claimant's presentation of his history as "questionably reliable." Upon examination Dr. Blake found the claimant's mood was not depressed or anxious, he was well-oriented to person, place, time, and situation, and he exhibited immediate retention. Dr. Blake did not believe the claimant was mentally retarded, but he found his intelligence level to be low average. He noted that if the claimant's intelligence level appeared lower on any testing, "it was probably the result of attention deficit or malingering." He exhibited the ability to engage in abstract thinking and exercise judgment. Dr. Blake assessed the claimant with possible adult attention deficit disorder (residual type) and antisocial personality disorder, and he believed the claimant could remember, comprehend, and carry out simple instructions on an independent basis and respond appropriately to work pressure, supervision, and co-workers (Tr. 174-75).

The claimant was referred by the disability determination division to Dr. William Bryant, Ph.D., in August 2002. The claimant reported that he was hearing voices telling him to commit suicide and to kill other people. Dr. Bryant administered the claimant the WAIS-III and characterized his performance "by transparent malingering." Although the claimant scored a verbal IQ of 61, performance IQ of 60, and full scale IQ of 57, Dr. Bryant found his scores were "essentially worthless," because he answered harder items correctly but could not answer the easier ones. The claimant's use of language was on a higher level than his scores indicated, and he seemed to be getting massive secondary gains and was passive-

aggressive and oppositional. Dr. Bryant believed the claimant could be suffering from a thought disorder, but noted it was impossible to tell if he could manage benefits because of his poor judgment (Tr. 211).

In September 2003 vocational rehabilitation specialist Angelia Parent provided a summary of the psychological evaluation conducted by Mr. Parham in August 1999. She recounted the assessment techniques used, the claimant's reported school history, his attempted suicide by overdose, and noted verbatim Dr. Parham's interpretation with regard to the claimant's performance on the various tests administered (Tr. 278-79).

The claimant also received treatment intermittently from Carl Albert Community Mental Health Center from June 1999 through March 2003. His first visit in June 1999 was shortly after his suicide attempt by overdose. He was suffering from low self-esteem, sadness, and suicidal thoughts (Tr. 255). He participated in group and individual therapy. Claimant underwent a psychiatric assessment at the center with C.A. Dejecacion, M.D., in June 1999. Although he appeared alert during the exam, he did not know the exact date and he completed serial sevens erroneously and slowly. He could not think abstractly, but he did enumerate similarities and differences between a bird and an airplane. His insight and judgment were adequate. Dr. Dejecacion assessed the claimant with adjustment disorder with mixed disturbance of emotions and conduct and borderline personality traits and intellectual functioning with a Global Assessment of Functioning ("GAF") score of 41 (Tr. 245-47). When discharged from treatment in October 2000, the claimant's primary diagnosis was psychotic disorder NOS and a current GAF score of 45 (Tr. 241-42).

The claimant returned to resume treatment in March 2002. He reported problems controlling his anger, auditory hallucinations (voices putting him down), and paranoid ideations (thinks people are out to get him). Staff psychiatrist Dr. Kenneth Williams, M.D., assessed him with psychosis NOS and started him on medication (Tr. 240). In July 2002 the claimant was examined by staff psychiatrist Dr. Charles Van Tuyl, M.D. He reported hearing voices occasionally and that he felt depressed and over-sedated from his medication. Dr. Van Tuyl observed that the claimant looked very depressed and somewhat sedated. He was assessed with major depression (recurrent) and psychotic disorder NOS (Tr. 238). The claimant worked for a short time through a Goodwill program and was discharged from care in January 2003. His final diagnosis was major depression (recurrent and in partial remission), borderline intellectual functioning, brain injury, social and occupational problems, and a GAF score of 55 (Tr. 233-34). However, he returned in March 2003, indicating he had not taken his medication for one month and was not doing well. He had moved to Texas and had not followed up with treatment there. He was having auditory and

visual hallucinations and could not hold a job. Dr. Van Tuyl assessed him with major depression with psychotic features (decompensating) (Tr. 232).

At step three of the sequential analysis, the ALJ is required to determine whether a claimant's impairment is equivalent to one of the listed impairments deemed so severe as to preclude substantial gainful activity. *Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996). Such an impairment "must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Listing 12.05 (which applies to mental retardation) provides, *inter alia*, that "[t]he required level of severity for this disorder is met when . . . [the claimant has a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05(C). There appears to be no dispute in this case that the claimant meets the second prong of this test, *i. e.*, that he has a "mental impairment imposing an additional and significant work-related limitation of function." On the contrary, the sole question here for purposes of Listing 12.05 would appear to be whether the claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70."

In this regard, the claimant was tested on three occasions, and his IQ scores never exceeded 70. However, one of the professionals who tested the claimant was a psychological assistant (according to the ALJ, "not an acceptable medical source") and the other two (who were both psychologists) split on the validity of the test scores, *i. e.*, one determined that test

scores accurately reflected the claimant's IQ, while the other determined that the claimant was malingering. A psychiatrist who *did not* test the claimant found his intelligence to be "low average" and opined that any test scores to the contrary would be due to malingering or attention deficit. Thus, while the ALJ conceded that "the claimant has a history of IQ testing that would indicate listing-level diminished intellectual functioning[,]" she nevertheless determined that the claimant did not meet Listing 12.05. (Tr. 21).

The claimant argues that he meets the listing *as a matter of law* and that the decision of the Commissioner should therefore be reversed with instructions to the ALJ to award social security benefits. The problem with this argument is that there *was* evidence in the claimant's medical record that would tend to support the ALJ's conclusion that the claimant did not meet the listing, *e. g.*, evidence of malingering. However, the ALJ erred in analyzing this evidence; she found that the claimant's IQ improved between 1999 and 2003, when in fact there was no such improvement.[2] This was a critical mistake that cannot be considered harmless, as the ALJ cited the erroneous finding as proof that the claimant's IQ test scores were invalid. (Tr. 21). The decision of the Commissioner must therefore be reversed for proper consideration by the ALJ of the claimant's IQ test scores.

Moreover, absent a finding that his IQ test scores improved, the question whether the

---

[2] As noted above, the first IQ test scores were assigned to the claimant by Don Parham, a psychological assistant whose findings the ALJ ignored because he was "not an acceptable medical source." (Tr. 21). Nevertheless, it was these IQ test scores that were summarized in a vocational rehabilitation report prepared in September 2003. (Tr. 278-79). The ALJ apparently thought these were new test scores and cited them as proof that the claimant's IQ scores had improved. (Tr. 22).

claimant actually meets a listing by falling within the range specified by Listing 12.05(C) becomes a much closer call, *i. e.*, the ALJ must now decide what is in essence a swearing match between psychiatric specialists as to the validity of the claimant's IQ test scores. Therefore, on remand the ALJ must carefully analyze the proper weight to give to the various medical opinions, *see, e. g., Hamlin v. Barnhart,* 365 F.3d 1208, 1215 (10th Cir. 2004) ("An ALJ must evaluate *every* medical opinion in the record, *see* 20 C.F.R. § 404.1527(d), although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional . . . An ALJ must also consider a series of specific factors in determining what weight to give *any* medical opinion."), *citing Goatcher v. HHS,* 52 F.3d 288, 290 (10th Cir. 1995) [emphasis added], and give specific reasons for the determinations she makes. *See, e. g., Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) ("When an ALJ decides to disregard a medical report by a claimant's physician, he must set forth 'specific, legitimate reasons' for his decision."), *citing Miller v. Chater,* 99 F.3d 972, 976 (10th Cir. 1996), *quoting Frey v. Bowen,* 816 F.2d 508, 513 (10th Cir. 1987).

**Conclusion**

The undersigned Magistrate Judge finds that the ALJ erred in her step-three analysis and that the decision of the Commissioner is therefore not supported by substantial evidence. Accordingly, the Magistrate Judge RECOMMENDS that the ruling of the Commissioner of the Social Security Administration be REVERSED and REMANDED for further proceedings as set forth above. Parties are herewith given ten (10) days from the date of this service to file with the Court Clerk any objections with supporting brief. Failure to

object to the Report and Recommendation within ten (10) days will preclude appellate review of the judgment of the District Court based on such findings.

**DATED** this 15th day of March, 2006.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**